In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1947 & 10-3914

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL REDMOND and CHARLES AVERY, JR.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Evansville Division.
Nos. 08 cr 29-6 & 08 cr 29-12—**Richard L. Young**, *Chief Judge.*

ARGUED DECEMBER 6, 2011—DECIDED JANUARY 12, 2012

Before POSNER, FLAUM, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* This is the consolidated appeal of Charles Avery, Jr. and Michael Redmond. Avery pled guilty to crack cocaine distribution in violation of 21 U.S.C. § 841(a)(1); he appeals the district court's denial of his request to withdraw his guilty plea, the calculation of the crack cocaine quantity attributed to him, as well as his sentence. Redmond pled guilty to crack cocaine distribution conspiracy in violation of 21 U.S.C. § 846

and appeals only his sentence. For the following reasons we affirm as to Avery, and issue a limited remand as to Redmond for the limited purpose of allowing the district court to reconsider his sentence in light of *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010).

## I. Background

In 2007, a joint federal, state, and local investigation uncovered a conspiracy to engage in transporting large quantities of crack cocaine from Chicago to Evansville, Indiana for distribution. Members of the conspiracy also trafficked firearms obtained in Indiana to Chicago.

From February through August 2008, law enforcement officers conducted controlled purchases and seizures of crack cocaine from members of the drug trafficking network, including Avery. The investigation culminated in a court-authorized wire surveillance of several cellular telephones used by members of the conspiracy. Redmond was overheard arranging multiple crack cocaine transactions. During the course of the investigation, Avery was identified as a crack cocaine distributor with ties to members of the conspiracy.

A federal grand jury returned an indictment charging Redmond, Avery, and seventeen co-defendants in thirty-five counts, including various crack cocaine and firearms trafficking related offenses.

**A. Avery**

On October 16, 2008, Avery was charged with three counts in a multi-defendant indictment. Count one alleged conspiracy to possess with intent to distribute, and counts five and seven alleged distribution of a substance containing a detectable amount of cocaine base on February 20, 2008 and March 3, 2008 respectively. Avery was scheduled for trial on Monday July 12, 2010, but on the morning of the trial, he informed the court that he wished to plead guilty to counts five and seven of the indictment.[1] That same day the government filed a motion to dismiss the conspiracy charge. The parties had previously entered into a trial stipulation that the February 20, 2008 buy involved .46 grams of cocaine base substance, and that the March 3, 2008 buy involved .38 grams of cocaine base substance. The court then held a change of plea hearing.

At the hearing, Sergeant Matt Schnell of the Vanderburgh County Sheriff's Department testified in support of the distribution charges. First, he testified to his knowledge of the two controlled purchases, the first on February 20, 2008, and the second on March 3, 2008. Next, he testified that on March 5, 2008, officers stopped Avery in a car and seized $880. Of the $880 seized from the car, $130 were police funds from controlled buys. The officers also seized a set of digital scales covered in cocaine

---

[1] Avery informed the government of his desire to enter his plea late on Friday, but without any paperwork, the government continued its preparation.

residue. Finally, Sgt. Schnell testified to various controlled buys and seizures of crack cocaine from co-defendants between March and August 2008 over objection. During the hearing, the government stated that it did not intend "to hold [Avery] responsible for any conspiracy weights." Avery pled guilty, without a plea agreement, to counts five and seven.

On November 30, 2008, the case reconvened for sentencing and Avery requested to withdraw his guilty plea based on findings of the presentence investigation report ("PSR"). He argued first that, contrary to the PSR's finding otherwise, he was entitled to a sentence reduction for acceptance of responsibility. Next, he objected to the amount of crack cocaine attributed to him. He also objected to his classification as a career offender.

The PSR found Avery responsible for 6 grams of crack cocaine, raising his offense level from 14 (less than 1 gram of crack cocaine) to 18 (6 grams of crack cocaine) pursuant to the 2010 sentencing guidelines. Avery objected based on the trial stipulation that less than one gram of cocaine was involved in the two buys. The government countered that $750 of the $880 found in Avery's car could be attributed to relevant conduct which amounted to approximately 6 grams of cocaine base. Additionally, the government argued that the difference in the cocaine amounts would not matter because the PSR classified Avery as a career offender which placed him at

a category VI.[2] Given the dispute regarding the cocaine quantity, the court did not "feel comfortable" proceeding with the sentencing at the November hearing and continued the sentencing hearing to December 13, 2008.

When the sentencing hearing resumed, the court heard testimony from Evansville police detective Mike Gray who was involved in the investigation concerning the drug purchases from Avery. Gray testified about information obtained from an informant, Giles, and the two buys Avery pled to totaling .84 grams. Apparently, Avery had reached out to Giles in mid-February 2008, indicating that he would be taking over sales from

---

[2] Avery is classified as a career offender. Pursuant to Guidelines § 4B1.1(b), if the offense level of a career offender from the table in that subsection is greater than the offense level otherwise applicable, the higher offense level from the table will apply. A career offender's criminal history in every case under the subsection is category VI.

In this case, the offense level otherwise applicable, depending on the cocaine quantity, would have been level 14 (less than 1gram), 18 (6 grams), or 30 (51.1 grams). However, the maximum term of imprisonment for violations of 21 U.S.C. § 841(b)(1)(C) (counts 5 and 7) is 20 years per count. The district court informed Avery that because of his prior felony narcotics conviction, the maximum statutory penalty would increase from 20 years to 30 years. Under the Guidelines, a maximum sentence of 30 years results in an offense level 34. Because level 34 is higher than any otherwise applicable level (14, 18, or 20, respectively), regardless of the amount of cocaine attributed to Avery, the higher level applies.

Giles' previous supplier, Lawrence Brandon. Brandon had recently been arrested. According to Gray, the informant regularly purchased crack cocaine from Avery during an approximately two-week period leading up to the first controlled buy. The informant would meet Avery on multiple occasions each day (sometimes up to five or six times daily) and purchase anywhere from one gram to 3.5 grams. At the hearing, the officer conservatively estimated that prior to the start of the controlled transactions on February 20, the informant would meet with Avery twice per day, to purchase one gram each time, to equal approximately 20 grams (1 gram per buy x 10 days x 2 meetings).[3] Gray also testified to a controlled buy that took place on February 28, 2008 where Avery sold Giles 3.2 grams of a substance that was fake cocaine. Finally, Gray explained to the court that on March 5, 2008, two days after the last controlled buy, Avery was pulled over in his car by police. Officers found $880, a scale, and a paper with his phone number written several times. Of the $880 found, $130 was police buy money. Gray believed that the remaining $750 were proceeds from other drug sales, and conservatively associated 7.5 grams of crack cocaine with the remaining cash. Adding these figures together totals 31.54 grams of crack cocaine. The district court, however, accepted

---

[3] We note that this estimate differs from the amount put forth in the government's sentencing memorandum. Using different figures, the sentencing memorandum estimates that the informant bought about 40 grams from Avery prior to the controlled buy (4 buys daily, 2 grams per buy, over 5 days).

the figures presented in the government's sentencing memorandum (estimating that Giles purchased 40 grams of crack cocaine from Avery prior to the controlled buys), and attributed 51.5 grams of cocaine base to Avery. This resulted in an offense level 30, but considering Avery's status as career offender, the offense level increased to 34.

Avery also objected to the PSR's conclusion that he is a career offender. Specifically, Avery argued that his three armed-robbery convictions, which occurred on March 10, 11, and 12, 1989, when Avery was 18, should not be considered separate convictions because they were charged under one case number, involved the same victims, and the sentences imposed ran concurrently. As the government pointed out, there were in fact three case numbers and he received separate sentences. The court overruled Avery's objection, finding that the offenses should be counted separately pursuant to the Guidelines.

Ultimately, Avery's offense level was determined to be 34, criminal history VI, with an advisory sentencing range of 262 to 327 months. Avery asked the district court to sentence below the Guidelines range, but did not seek a variance based upon the disparity between crack and powder cocaine. He was sentenced to 262 months for counts 5 and 7 to be served concurrently.

### B. Redmond

Redmond pled guilty without a plea agreement to count one of the indictment, conspiracy to possess with

intent to distribute in excess of 50 grams of cocaine base. The district court determined that for Guidelines purposes, Redmond was accountable for approximately 3 kilograms of crack cocaine, resulting in a Guidelines offense level 36. That Redmond was a career offender bumped his offense level up to 37. Redmond received a 3-level reduction for acceptance of responsibility, decreasing his offense level to 34. Prior to the plea being finalized, Redmond's attorney indicated that he would argue against the career offender calculation under 18 U.S.C. § 3553(a). Redmond was classified as a career offender under § 4B1.1, with a criminal history category of VI. The resulting advisory Guidelines sentencing range was determined to be 262 to 327.

After agreeing that Redmond was a career offender, defense counsel asked the court to deviate downward pursuant to § 3553(a). Counsel argued that Redmond's criminal history was overstated because (1) his most serious conviction, for robbery, was when he punched a man and took $40; (2) that his controlled substance violations were use-related, not sales-related; and (3) that his longest period of confinement prior to the instant offense was 16 months. Comparing the sentences of Redmond's co-defendants, counsel noted that many had received lesser sentences of 87 or 144 months. In light of Redmond's criminal history, he requested a sentence of 15 or 16 years.

Ultimately, the court agreed that Redmond's career criminal status "may overstate the seriousness of his arrest history" and indicated that it would "deviate

down from the guidelines." Stating that "the defendant, Mr. Redmond, is technically under the guidelines a career offender", the court imposed a sentence of 240 months. When Redmond expressed his surprise and dismay at this sentence, the court responded that "[t]he court has deviated from the Guidelines. The Guidelines were 262 months . . . so the court has already come down on your sentence." When Redmond persisted, the court stated, "Well, I understand all that, and I've explained my reasons for the sentence. I don't think we need to go back over it. But the guidelines categorized you as a career offender . . . . That's pretty serious. Its hard to deal with that."

## II. Discussion

Avery presents three issues on appeal, while Redmond presents just one. Avery first argues that the district court erred when denying his request to withdraw his guilty plea. Next, he disputes calculation of the amount of drugs reasonably foreseeable to him. Finally, both Avery and Redmond contend that the district court failed to understand its discretion to depart downward from the Sentencing Guidelines, and ask that we remand for resentencing.

### A. Avery's Request to Withdraw His Guilty Plea

The decision to deny Avery's motion to withdraw his guilty plea rests within the discretion of the district court, and is reviewed only for abuse of discretion. *United*

*States v. Cavender*, 228 F.3d 792, 803 (7th Cir. 2000). After
a district court accepts a guilty plea, it may allow a de-
fendant to withdraw that plea before sentencing if
he can show a "fair and just reason for requesting the
withdrawal." Fed. R. Crim. P. 11(d)(2)(B). This includes
when the plea was not entered into "voluntarily, know-
ingly, and intelligently, with sufficient awareness of
the relevant circumstances and likely consequences."
*Bradshaw v. Stumpf*, 545 U.S. 175, 182 (2005) (internal
quotation and citation omitted). There is no absolute
right to withdraw a guilty plea. *United States v. Chavers*,
515 F.3d 722, 724 (7th Cir. 2008). Because the defendant's
statements given under oath during the plea colloquy
are presumed to be true, he bears a heavy burden of
persuasion in showing that a "fair and just reason" for
withdrawing the guilty plea exists. *Id*. Avery argues that
he should have been allowed to withdraw his guilty
plea because he disagreed with three findings of the
district court: (1) the crack cocaine amount attributed
to him for Sentencing Guidelines purposes; (2) his status
as a career offender under the Guidelines; and (3) his
failure to receive an adjustment to his offense level
for acceptance of responsibility. Avery, however, pled
guilty without the benefit of a plea agreement and there-
fore had no guarantees from the government regarding
any of his points of contention.

  1.  The crack cocaine quantity

Avery pled guilty to two counts of distribution based
on his expectation that he would be sentenced for sales

totaling less than one gram of crack cocaine. This expectation was founded on the prosecutor's trial stipulation that he did not "intend to hold [Avery] responsible for any conspiracy weights", Sgt. Schnell's testimony as to the two buys totaling less than one gram, and the district court's assurance that testimony elicited as to the conspiracy was purely for context. When Avery learned that 6 grams of drugs were attributed to him in the PSR, he requested to withdraw his plea. He alleges that "all the information given to him by the government and the district court indicated he was pleading to an amount of drugs less than one gram." Indeed, when Avery pled guilty, the government acknowledged the stipulation regarding the drugs involved in the two transactions, but reiterated that there were no agreements between the parties as to the ultimate relevant conduct for sentencing purposes. Though he laments that there was no "meeting of the minds" for purposes of his plea, Avery pled guilty without the benefit of a plea agreement. Moreover, because Avery was sentenced as a career offender, the crack cocaine quantity was irrelevant. Accordingly, he is not entitled to withdraw his guilty plea based on the crack cocaine quantity attributable to him.

The PSR reached 6 grams by adding the quantity of drugs purchased in the controlled buys to a conservative estimate of the quantity of drugs attributable to the $750 found in Avery's car when it was pulled over by police. Though the PSR attributed 6 grams to Avery, the government's sentencing memorandum argued that 51.5 grams of cocaine base were reasonably foreseeable

and attributable to Avery. The government calculated 51.5 grams by including two additional quantities: an estimated quantity of drugs purchased by Giles prior to the controlled transactions, and a buy in which Avery sold Giles a sham substance.[4] Testimony regarding these two additional quantities was only heard after Avery's plea. The district court ultimately adopted the government's calculation.

It is uncontested that Avery sold less than one gram (.84g) of crack cocaine to a police informant on February 20 and March 3, 2008; there was a stipulation regarding the quantities involved in those two buys. However, there was *not* a relevant conduct stipulation because there was no plea agreement. While Avery argues that he had no understanding that anything more than one gram would be attributed to him, the government and the court discussed the fact that there was *no* stipulation as to relevant conduct.

---

[4] As the government argued, during the same course of conduct and time frame, Avery also sold additional quantities to the same informant totaling approximately 40 grams of crack cocaine prior to the first controlled buy on February 20. On February 28, 2008, the informant arranged another cocaine base transaction with Avery, wherein Avery sold 3.2 grams of fake cocaine. Then, on March 5, 2008, Avery was stopped by police and found in possession of $880, a digital scale covered in cocaine residue and his handwritten business cards. Though $130 was police buy money, the government estimated that the remaining $750 represented the previously distributed purchase price of approximately 7.5 grams.

The Court: Because there's a stipulation as to—my understanding, there's a stipulation as to the weight of the cocaine that you had?

Defendant: Yes, sir.

The Court: Okay. If there wasn't a stipulation, you may very well, in considering relevant conduct, may have been held responsible for any cocaine in the conspiracy that may have been foreseeable to you.

Defendant: Yes, sir.

The Court: Do you understand that?

Defendant: Yes, sir.

The Court: But my understanding is there's a stipulation as to the weight, Mr. Brookman [the prosecutor]?

Brookman: Judge, there was a trial stipulation filed as to Count 5 and Count 7 of the weight of the cocaine, crack cocaine that was involved in each one of those incidents. There's no stipulation, no agreements at all about relevant conduct. This is a plea without plea agreement. However, I'll state for the record that I don't believe the defendant—I'm dismissing Count 1, the conspiracy, so I don't intend to hold him responsible for any conspiracy weights.

The Court: Okay.

Brookman:    But there is no stipulation or any agreement.

Avery was therefore aware that it was not only the amount of crack cocaine that would be at issue at sentencing, but *also* the relevant conduct drug weight attributable to the defendant.

Even if Avery was under a reasonable misapprehension of what quantity would be attributable to him based on his reliance on the government's representations, Avery's status as a career offender, which raised his offense level to 34, made the relevant conduct drug weight irrelevant in determining his Guidelines sentencing range. As a career offender, Avery's Guidelines status is not governed by any amount of crack cocaine attributable to him. Avery's offense level was increased because he was a career offender and would remain unchanged regardless of the amount of crack cocaine the court found attributable to Avery. In other words, whether the quantity of crack cocaine was determined to be one gram, six grams, or fifty grams, the base offense level would have been the same by virtue of his career offender status.

Irrespective of whether the crack cocaine amount would ultimately matter, Avery pled guilty without the benefit of a plea agreement and was clearly alerted to the fact that he had no guarantee or assurance as to what his relevant conduct drug amount would be. "A mistake about the substantive offense goes to the heart of the guilty plea; a mistake about the possible sentence—especially when the defendant has been warned

that the judge will determine the sentence based on information collected by the Probation Office and at any sentencing hearing—does not." *United States v. Bowlin*, 534 F.3d 654, 660 (7th Cir. 2008). This Circuit has consistently held that "the fact that a defendant underestimated his sentence when entering his plea is not a fair and just reason to permit him to withdraw that guilty plea." *Id*. (citing *United States v. Gilliam*, 255 F.3d 428, 433-34 (7th Cir. 2001)). Here, Avery understood the contours of his guilty plea. Though his understanding of the drug quantity attributable to him was incorrect, this is not a mistake going to the substantive offense. Moreover, the dispute regarding drug quantity is of no moment because that quantity ultimately had no bearing on his sentence because of his career offender status. Accordingly, Avery's objections to the crack cocaine quantity do not constitute a valid reason to withdraw his plea.

### 2. Career Offender Status

Next, Avery argues that his change of plea request should have been granted because he had a reasonable expectation of not being classified as a career offender based on the information filed by the government pursuant to 21 U.S.C. § 851.[5] That information differed

---

[5] The statute, 21 U.S.C. § 851(a)(1) provides that:

No person who stands convicted of an offense under this part shall be sentenced to increased punishment by

(continued...)

from the facts relied upon by the district court in deter-
mining his career status; the 851 information filed by
the government identified only one past felony drug
conviction, which would subject Avery to a sentencing
enhancement, whereas the PSR identified Avery as a
career offender based on multiple convictions for armed
robbery.[6]

It is clear that Avery was advised of the possible sen-
tence enhancement based solely on his prior narcotics
conviction. However, the PSR lists three armed robbery
convictions as the basis for his career criminal status.
Pursuant to the Guidelines, a defendant is a career
offender if (1) the defendant was at least eighteen years
old at the time the defendant committed the instant
offense of conviction; (2) the instant offense of conviction
is a felony that is either a crime of violence or a con-

---

[5] (...continued)
    reason of one or more prior convictions, unless before
    trial, or before entry of a plea of guilty, the United States
    attorney files an information with the court (and serves
    a copy of such information on the person or counsel for
    the person) stating in writing the previous convictions to
    be relied upon.

[6] While Avery objects that his three armed-robbery convictions,
which occurred on March 10, 11, and 12, 1989, should not
be considered separate convictions, we disagree. There were
in fact three case numbers assigned to these three offenses,
and Avery received separate sentences for each charge. The
district court concluded that these were three convictions,
and Avery provides no basis for overruling this finding.

trolled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1 (2010). Based on the 851s filed, Avery had only one prior felony conviction, which is insufficient to render him a career offender under the Guidelines. The question, then, is whether the notice requirement of 21 U.S.C. § 851(a)(1) applies to a defendant who receives an increased sentence under the Guidelines by virtue of his criminal history. It does not.

The notice requirement of 21 U.S.C. § 851(a)(1), does not apply to charges used to establish career criminal status. Instead, the requirement that the government submit an information under § 851 applies only when enhanced penalties are imposed under 21 U.S.C. § 841(b). *See United States v. Galati*, 230 F.3d 254, 263 (7th Cir. 2000); *Damerville v. United States*, 197 F.3d 287, 289 (7th Cir. 1999) (per curiam). In *Damerville*, this court held that defendants subject to sentencing as career offenders under § 4B1.1 "are not entitled to the same procedural protections as defendants subject to the § 841(b) penalty enhancements (for which § 851 applies)." 197 F.3d at 289; *see also United States v. Jackson*, 121 F.3d 316, 319 (7th Cir. 1997); *United States v. Robinson*, 14 F.3d 1200, 1206 (7th Cir. 1994). "The filing of an enhancement information before entry of a guilty plea, while mandated by § 851 to trigger enhancement under § 841(b), is not a prerequisite when the government seeks career offender sentences under the guidelines." *Damerville*, 197 F.3d at 289. Thus, the government was not required to give additional

notice of other convictions that might trigger the career-offender designation under § 4B1.1 because Avery was sentenced under § 4B1.1. *See Galati*, 230 F.3d at 263. To the extent that his sentence was enhanced pursuant to § 841(b), Avery received proper notice as the government filed the required 851s prior to his plea. Moreover, Avery and his counsel "discussed on numerous occasions" the possibility that Avery would be sentenced as a career offender and the impact such a determination would have on his Guidelines range. Accordingly, Avery's objections to his career offender status do not constitute a fair and just reason to allow him to withdraw his plea.

### 3.   Adjustment for Acceptance of Responsibility

Finally, Avery argues that his failure to plead guilty was beyond his control because the government pursued a conspiracy count against him until the day of trial. When the government withdrew this charge, Avery pled guilty to two counts of distribution. Avery fails to explain how the government's refusal to drop the conspiracy charge prevented him from pleading guilty to the two distribution counts. Moreover, Avery acknowledged that he chose to plead at a late date, resulting in the government having to fully prepare the matter for trial; the Sentencing Guidelines lists timeliness as an appropriate consideration in determining a defendant's eligibility for an acceptance of responsibility reduction. U.S.S.G. § 3E1.1, Application Note 1(h) (2010). It is well established that the last minute decision to plead guilty

is a valid basis to deny a reduction for acceptance of responsibility. *United States v. Rosalez-Cortez*, 19 F.3d 1210, 1219 (7th Cir. 2010).

Although Avery suggests that he would have pled guilty sooner had he not faced trial on count one of the indictment, during plea negotiations Avery rejected plea offers that gave him the option of pleading guilty to count 5, with the dismissal of counts 1 and 7. Moreover, during the final pretrial conference, held on June 28, 2010, the government informed defense counsel and the court that it would proceed to trial on counts 5 and 7 only, and planned to dismiss count 1 as to Avery. Still, Avery waited until July 12, 2010 to enter his plea.[7] Accordingly, he was not entitled to an adjustment for acceptance of responsibility.

Avery pled guilty without the benefit of a plea agreement and is entitled to withdraw this plea only for a "fair and just" reason. Avery presented no legitimate reason to withdraw his plea; his plea was entered knowingly and intelligently. Therefore it was not an abuse of discretion when the district court denied Avery's request to withdraw his guilty plea. We affirm the decision of the district court.

---

[7] We acknowledge that "late" Friday, July 9, Avery's attorney left a voice message for the government indicating his intention to plead guilty, but without any paperwork, the government proceeded as if trial would commence on Monday, July 12.

### B. The Calculation of Drugs Reasonably Foreseeable to Avery

Avery next argues that the district court erred when calculating the amount of drugs reasonably foreseeable to him. The clear error standard of review applies to factual findings made by the district court for purposes of determining the applicable advisory guidelines range. *United States v. McLee*, 436 F.3d 751, 765 (7th Cir. 2006). Again, we note that Avery's offense level was determined not by the drug weight, but by his career offender status. Even so, we affirm the finding of the district court.

The government must prove the quantity of drugs for sentencing purposes by a preponderance of the evidence. *United States v. Krasinski*, 545 F.3d 546 (7th Cir. 2008). The offense level is calculated by determining the amount of drugs associated within the same course of the defendant's conduct, and not simply the amount associated with the particular offenses of conviction. *United States v. White*, 888 F.2d 490, 500 (7th Cir. 1989). The rules of evidence do not apply at sentencing, and in determining relevant conduct, a court may consider a broad range of information, including uncharged crimes, crimes where charges have been dismissed, and crimes for which the defendant has been acquitted. *United States v. Valenti*, 121 F.3d 327, 334 (7th Cir. 1997). Drug quantities may be estimated based upon average sales over a given time, or by converting money earned in prior sales into an estimated quantity sold. *United States v. McMillen*, 8 F.3d 1246, 1250-51 (7th Cir. 1993); *United States v. Townsend*, 73 F.3d 747, 753 (7th Cir. 1996).

Though Avery argues that the government included drug quantities attributable to the conspiracy, the evidence does not support this contention.

The government set forth facts to establish that 51.5 grams of cocaine base were reasonably foreseeable and attributable to Avery. These facts were supported by testimony presented to the court. Avery sold less than one gram (.84g) of crack to a police informant on February 20 and March 3, 2008. During the same course of conduct and time frame, but prior to the controlled transaction, Avery sold additional quantities to the same informant totaling approximately 40 grams of crack cocaine.[8] On February 28, 2008, the informant arranged another cocaine base transaction with Avery, wherein Avery sold 3.2 grams of cocaine base. Then, on March 5, 2008, Avery was stopped by police and found in possession of $880 (cash proceeds from previous crack sales), a digital scale covered in cocaine residue, and his hand-written business cards. Of the $880 found, $130 was marked buy money supplied by the government. The government estimated that the remaining $750 repre-

---

[8] We note that 40 grams is merely an estimate. Testimony from Detective Gray established that approximately one to two weeks prior to the first controlled buy on February 20, Giles made daily purchases from Avery. Giles would purchase anywhere from one to 3.5 grams of crack cocaine at a time, sometimes up to five or six times per day. Although the district court could have used a more conservative number as an estimate, an estimate attributing 40 grams of crack cocaine to Avery during this period is supported by the record.

sented the previously distributed purchase price of approx-
imately 7.5 grams. Adding these totals together equals
51.54 grams; the quantities of crack cocaine distributed
by the members of the conspiracy were not included in
this calculation. The court heard credible testimony
regarding all of these transactions. Based on this
evidence, the district court reasonably concluded that
the readily provable quantity of crack cocaine directly
attributable to Avery for purposes of determining his
advisory Guidelines range was 51.5 grams.

### C.  The Court's Understanding of Its Discretion

Redmond argues that the court might not have under-
stood its discretion to sentence outside the Guideline
range, pursuant to *United States v. Corner*, 598 F.3d 411,
415 (7th Cir. 2010). Avery adopts and incorporates
Redmond's argument as to his own sentence. Because
Redmond and Avery failed to present these issues at the
time of sentencing, the review is for plain error. *United
States v. Morgan*, 384 F.3d 439, 442 (7th Cir. 2004).

In *United States v. Kimbrough*, 552 U.S. 85 (2007), the
Supreme Court restated its holding in *United States v.
Booker*, 543 U.S. 220 (2005), that "under *Booker*, the
cocaine Guidelines, like all other Guidelines, are advisory
only" and further explained that "it would not be an
abuse of discretion for a district court to conclude when
sentencing a particular defendant that the crack/cocaine
disparity yields a sentence greater than necessary to
achieve § 3553(a)'s purpose, even in a mine-run case." 552
U.S. at 110. Later, in *United States v. Spears*, it again clarified

"that was indeed the point of *Kimbrough*: a recognition of district courts' authority to vary from the crack-cocaine Guidelines based on a policy of disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." 555 U.S. 261, 264 (2009). The Court explained, "we now clarify that the district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines." *Id.* at 265-66. The Seventh Circuit has likewise recognized that a district court can vary categorically from every guideline, including the career offender guidelines. *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010) (en banc).

Redmond's sentence was affected by his classification as a career offender under § 4B1.1. As a career offender, he was assigned an offense level of 34, whereas had he been sentenced to the "offense level otherwise applicable" his offense level would have been a 33. Though Redmond considers the district court's repeated references to his career offender status as signaling "an attempt by the court to justify a sentence it felt grudgingly obliged to impose, against its better judgment," he acknowledges that the court's downward departure (from 262 at the low end of the guidelines to a sentence of 240) might have been "all the break it was inclined to give" Redmond. Even so, Redmond argues that we cannot assume that the district court would have stopped at 20 years, had it known that § 4B1.1 was non-binding. *Corner*, 598 F.3d at 426. As such, Redmond urges us to remanded his case back to the district court for clarification.

Though the court certainly could have varied its sentence further, Redmond presents little to show that the district court was constrained in its decision making process. Moreover, that the court sentenced Redmond *below* the advisory career offender range, suggests that it was not constrained by the guideline calculation. Even so, the district court did suggest that Redmond's status as a career offender was a significant factor in its sentence, and it is not clear that the court recognized its complete discretion to deviate from the Guidelines career-offender calculation. *Corner* was decided after Redmond was sentenced, so we return this case to the district court on a limited remand to allow the court to indicate whether it might be inclined to impose a different sentence if it knew the full extent of its discretion. *See United States v. Womack*, 610 F.3d 427, 434 (7th Cir. 2010).

Turning to Avery, he likewise argues that the district court might not have understood its discretion to sentence outside the career offender guidelines. Avery, however, was sentenced almost nine months after our decision in *Corner*, and we presume that a district court understands its authority to depart downward. *United States v. Baretz*, 411 F.3d 867, 877 (7th Cir. 2005) (citing *United States v. Larkins*, 83 F.3d 162, 168 (7th Cir. 1996)). The defendant has the burden to demonstrate otherwise. *Id*. Avery's only support to show the district court's misunderstanding of its authority is its statement that "I sentenced you at the low end of the guidelines, but your prior criminal history here is what's generating in part such a high guideline." While this suggests

that the district court considered the Guidelines when formulating Avery's sentence, the court also informed Avery that "I consult with the advisory guidelines, and the guidelines are, indeed, advisory; I may follow them; I may not." Avery offers no basis, aside from the fact that the district court sentenced him within the Guidelines, to suggest that the court was unaware of its discretion to depart from the proscribed sentencing range. Accordingly, we affirm the district court.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's decision refusing Avery's request to withdraw his guilty plea, its calculation of the crack cocaine quantity attributable to Avery, and his sentence. As to Redmond, we order a LIMITED REMAND consistent with this opinion.